UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JORDON BOWEN,

Plaintiff,

v. Case No. 3:26cv560-TKW-HTC

MARK THIEME,

Defendant.
_______________________/

REPORT AND RECOMMENDATION

Plaintiff Jordon Bowen ("Bowen"), proceeding *pro se*,[1] filed an amended complaint under 42 U.S.C. § 1983 alleging Defendant Mark Thieme ("Thieme") retaliated against him in violation of his First Amendment rights. Doc. 20. Upon consideration of Thieme's amended motion to dismiss (Doc. 28), Bowen's response in opposition (Doc. 30), Bowen's Notice of Supplemental Authority (Doc. 32), and the relevant law, the undersigned recommends the motion to dismiss be GRANTED. Bowen has failed to state a claim for retaliation and, even if he had, Thieme is entitled to qualified immunity.

[1] Bowen has also filed a notice of appearance on his own behalf. Doc. 31. However, a lawyer who represents himself is not considered an "attorney" in his own case. *See Price v. Comm'r of Internal Revenue*, 2025 WL 3755422, at *2 (11th Cir. Dec. 22, 2025). Thus, the notice of appearance is unnecessary.

## I. BACKGROUND

Bowen was a volunteer Lieutenant Colonel and Commander of the Special Missions Unit ("SMU") in the Florida State Guard ("FSG"), a volunteer state defense force under the command of the Governor and organized under Florida Statute § 251.001. Defendant Thieme is the Director of the FSG and was Bowen's supervisor. Bowen alleges Thieme relieved him of his position in January 2026 for reporting concerns about Thieme to a State Representative and the Lieutenant Governor. The following relevant facts are taken from the amended complaint and accepted as true:

In October 2025, multiple FSG "witnesses from outside [Bowen]'s chain of command" approached Bowen about Thieme's "alleged misuse" of "state resources, questionable use of government aircraft, use of emergency blue lights without operational necessity, carrying a service weapon without adequate training or certification, abuse of authority, deterioration of command climate, and leadership conduct that caused fear of humiliation, reprisal, or retaliation among commanders and staff." These FSG members approached Bowen because "they viewed [him] as a trusted leader."

Those witnesses told Bowen they were considering taking their concerns to the Inspector General and media, but Bowen asked if they would delay doing so temporarily so Bowen could first "report the concerns to higher state leadership

Page 3 of 27

outside [his] ordinary chain of command" because he wanted "to minimize disruption to FSG operations while still reporting matters of public concern."

On October 13, 2025, Bowen met with State Representative Danny Alvarez ("Alvarez") and reported the concerns regarding Thieme's conduct. Bowen initiated the meeting using his personal cell phone.

On the same day, Bowen spoke with Mark Stephens ("Stephens"), another volunteer member of the SMU who had a "pre-existing professional relationship" with Lieutenant Governor Collins ("Collins"), and asked Stephens if he could use that relationship to determine whether Collins would "receive concerns" regarding Thieme. Stephens then contacted Collins's assistant, who advised Bowen "by official email" that Collins "wanted an update on the SMU's efforts and actions and later contemplated further communication."

On October 15, 2025, Bowen learned that Jay Arnold ("Arnold"), "who had been in Plaintiff's supervisory chain and then served in a role in the Executive Office of the Governor that oversaw matters related to Thieme," heard "someone" was raising concerns about Thieme's conduct. Bowen told Arnold that he was the person raising such concerns.

On October 18, 2025, Stephens "separately" raised concerns about Thieme with Collins.

Page 4 of 27

On October 22, 2025, Bowen spoke with Collins on Bowen's cell phone, while at home, and reported his concerns.

On November 5, 2025, Collins and his staff, along with Arnold, met with Thieme. Bowen does not know what Arnold said at that meeting.

On December 4, 2025, Thieme began making "statements to staff members that the SMU was being 'shady'" and that he did not know what Bowen's team was doing. Thieme also accused the SMU of overspending its budget by approximately $123,000.

On December 8, 2025, Stephens, in his "separate federal advisory/coordinator capacity" role with a "federal Department of Defense program associated with USSOCOM," drafted a "preliminary Memorandum of Understanding" ("MOU") "as an example of potential partnership language" and "using the SMU as a hypothetical." The document was marked "DRAFT" and contained placeholder signature lines. Stephens shared this draft with Collins's assistant by sending it to her personal email, only after a direct request from her to provide the draft. At the time, Bowen did not know Stephens had prepared the draft MOU.

On December 15, 2025, Bowen was notified that Thieme had ordered a counseling statement, which was being prepared and issued to Bowen "regarding actions allegedly taken by Stephens involving the draft MOU."

On December 16, 2025, Bowen received the counseling statement. On the same day, Bowen submitted a written rebuttal.

On December 18, 2025, Thieme sent Bowen a text message requesting a short telephone call and indicating that Bowen's team was "trending rapidly in the wrong direction" but that the issue was "all correctable."

On December 19, 2025, Thieme directed Bowen to sign the counseling statement and issue directed counseling to Stephens, and ordered remedial ethics training for Bowen, leadership, and any available SMU members.

Bowen later submitted a second written rebuttal explaining that he would not sign the counseling statement or issue directed counseling to Stephens "based on inaccurate facts." There was no further communication between Bowen and Thieme after Bowen's submission of the second response.

On January 9, 2026, Thieme issued a "Relief of Command" order to Bowen, stating it "was based on loss of confidence and trust in [Bowen's] ability to command the unit and be a member of the Guard."

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court must liberally construe Bowen's *pro se* allegations, *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972), but conclusory allegations and legal conclusions couched as factual allegations are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 681; *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## III. DISCUSSION

### A. First Amendment

"A government employer may not demote or discharge a public employee in retaliation for speech protected by the First Amendment." *Alves v. Bd. of Regents of the Univ. Sys. of Ga.*, 804 F.3d 1149, 1159 (11th Cir. 2015). Determining whether the First Amendment protects the speech of a public employee requires "a careful balance 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of … an employer[ ] in promoting the efficiency of the public services it performs through its employees.'" *Green v. Finkelstein*, 73 F.4th 1258, 1263 (11th Cir. 2023) (citing *Lane v. Franks*, 573 U.S. 228, 231 (2014)). Thus, to succeed on a First Amendment retaliation claim, the employee must show that (1) the speech was made as a citizen on a matter of public concern; (2) the employee's free-speech interest outweighs the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played

a substantial part in the adverse employment action.[2] *See Green*, 73 F.4th at 1263 (citing *Bryson v. City of Waycross*, 888 F.2d 1562, 1565–66 (11th Cir. 1989)). The first two inquiries are questions of law for the Court. *See Moss v. City of Pembroke Pines*, 782 F.3d 613, 617-18 (11th Cir. 2015).

**B. Bowen Spoke as a Public Employee**

The first element of a First Amendment retaliation claim asks two questions: (1) was the public employee speaking as a citizen or as an employee; and (2) if he spoke as a citizen, did he speak on matters of public concern. *See Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir. 2007). If the government employee was speaking as an employee, there can be no First Amendment protection, and the constitutional inquiry ends. *Id.* at 1342.

Combining those questions into one, Thieme argues Bowen did not speak as a citizen about a matter of public concern because his purpose in speaking to Alvarez and Collins was to benefit his employer by preventing the issues from being elevated to the FSG Inspector General or the public. Doc. 28 at 10. Addressing the first question, Bowen argues, in response, that he spoke as a citizen because it was not part of his ordinary duties to report on Thieme's conduct. Bowen alleges his

[2] The Eleventh Circuit has also described the elements for a retaliation claim as requiring a plaintiff to show that (1) he engaged in protected speech; (2) the defendant's conduct adversely affected the protected speech; and (3) a causal connection exists between the speech and the defendant's retaliatory actions." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016).

"ordinary responsibilities were limited to command, training, readiness, and mission oversight of the SMU. They did not include reporting the FSG Director's alleged misconduct to elected officials, serving as a legislative liaison, investigating [the Director], or functioning as an internal complaint officer." Doc. 20 at 25, ¶ 128.

Generally, a public employee who speaks "pursuant to his official duties" does not speak as a "citizen" for First Amendment purposes. *Garcetti v. Ceballos,* 547 U.S. 410, 424 (2006) (finding deputy district attorney who wrote a memo "pursuant to his duties" was not speaking as a citizen). However, whether a public employee spoke as a citizen cannot be determined by looking at formal job descriptions, as they "'often bear little resemblance to the duties an employee actually is expected to perform.' Instead, *Garcetti* and its progeny require a 'functional review' of an employee's speech in relation to her duties or responsibilities." *Alves*, 804 F.3d at 1164 (internal citations omitted); *Garcetti*, 547 U.S. at 425 ("the listing of a given task … is n[ot] necessary … to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes"). "The central inquiry is whether the speech at issue 'owes its existence' to the employee's professional responsibilities."[3] *Moss*, 782 F.3d at 618 (citations omitted).

---

[3] In determining whether an employee is speaking as a citizen, courts consider "practical factors" such as "the employee's job description, whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee's job." *Id.* at 1161 (cleaned up);

Here, applying that "functional review," and accepting Bowen's allegations as true, the undersigned finds Bowen spoke as an employee when he reported Thieme's conduct to Collins and Alvarez. First, Bowen alleges the FSG members approached him because he is a "trusted leader" within the FSG. Second, Bowen spoke to Collins after Collins's office sent an "official email," asking for "an update on the SMU's efforts and actions." Third, although Bowen reported Thieme's conduct "outside" of the FSG hierarchy, he reported it to Collins, someone in the Governor's office, and the Governor is the commander in chief of the FSG. Thus, the Governor has direct oversight over the FSG.

Fourth, Thieme was Bowen's supervisor and the Director of the FSG, and the concerns raised related to the way Thieme carries out his duties with the FSG, including Thieme's leadership and command of the FSG. *See Boglin v. Bd. of Trs. of Ala. Agric. & Mech. Univ.*, 290 F. Supp. 3d 1257, 1269 (N.D. Ala. 2018) ("[A]s the Eleventh Circuit has repeatedly found, an employee who makes internal reports regarding mismanagement and fraud generally speaks pursuant to her professional duties rather than as a citizen.") (citing *Alves*, 804 F.3d at 1164-65)). Fifth, as Thieme argues, Bowen's purpose in reporting Thieme's conduct to Collins and

---

*see also Fernandez v. Sch. Bd. of Miami-Dade Cnty., Fla.*, 898 F.3d 1324, 1332 (11th Cir. 2018) (identifying factors of "(1) speaking with the objective of advancing official duties; (2) harnessing workplace resources; (3) projecting official authority; (4) heeding official directives; and (5) observing formal workplace hierarchies").

Alvarez was to "minimize disruption to FSG operations." *See Vanlandingham v. City of Abbeville, Ala.*, 455 F. Supp. 3d 1259, 1265 (M.D. Ala. 2020) (citing *Anderson v. Burke County, Ga.*, 239 F.3d 1216, 1221 (11th Cir. 2001)) ("Whether the speech was given to a limited audience or as part of a public dialogue is also a consideration.").

Thus, regardless of whether reporting Thieme's conduct to Collins and Alvarez was within Bowen's ordinary duties, the concerns Bowen raised regarding Thieme's alleged mismanagement of the FSG or abuse of authority as Director of the FSG, "owe[] [their] existence" to his professional responsibilities, and "cannot reasonably be divorced from those responsibilities." *Alves*, 804 F.3d at 1165 (internal citations omitted) (agreeing with the district court that plaintiffs did not speak as citizens despite plaintiffs' argument that the memo they submitted to University officials criticizing the Director's management was not within their ordinary duties and was submitted outside the normal chain of command); *see also, Fails v. Bd. of Trs. Univ. of W. Fla.,* No. 3:22CV7026-TKW-HTC, 2023 WL 5666438, at *13 (N.D. Fla. Sept. 1, 2023) (finding memo written by a seasoned member of the UWF police force regarding a perceived failure of leadership and lack of procedural compliance was not speech made as a citizen, but as an employee); *Murphy v. Gilmer Cnty., Ga.*, 2013 WL 1213310, at *7 (N.D. Ga. Mar. 25, 2013) ("It matters not that reporting safety concerns was not part of Plaintiff's

formal job description. Clearly, Plaintiff's speech owed its existence to his professional responsibilities.").

Because Bowen did not speak to Collins and Alvarez as a citizen, his conversations are not protected speech.

**C. The "Main Thrust" of the Conversations was not on Matters of Public Concern.**

Even if Bowen spoke to Alvarez and Collins as a citizen, he did not speak on matters of public concern. Whether speech is on a matter of "public concern" "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *See Connick v. Myers*, 461 U.S. 138, 147–48 n.7 (1983); *Deremo v. Watkins*, 939 F.2d 908, 910 (11th Cir. 1991). Speech involves matters of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps,* 562 U.S. 443, 453 (2011). And, because it is rarely the case that any speech is "entirely private or entirely public," the Court must look at the whole record and ask, "whether the main thrust of the speech in question is essentially public in nature or private." *See Alves*, 804 F.3d at 1162; *see also, Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1283 (11th Cir. 2006) (internal citations omitted) ("[i]n determining whether an employee's speech touched on a matter of public concern, we ask: whether the 'main thrust' of the speech in question

is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was.").

Here, Bowen reported Thieme's "questionable use of government aircraft, use of emergency blue lights without operational necessity, carrying a service weapon without adequate training or certification, abuse of authority, deterioration of command climate, and leadership conduct." Doc. 20 at 6. Bowen argues these complaints extend "well beyond an ordinary workplace dispute," and relate to matters affecting "waste and misuse of taxpayer-funded resources." Doc. 30 at 13. The undersigned disagrees.

Determining whether speech is a matter of public concern involves a "practical" inquiry. *Miles v. Hamm,* 772 F. Supp. 3d 1290, 1300 (M.D. Ala. 2025) (citing *Garcetti*, 547 U.S. at 424). It cannot be presumed that "all matters which transpire within a government office are of public concern"; at the same time, "a public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." *Ferrera v. Mills,* 781 F.2d 1508, 1516 (11th Cir. 1986) (internal citations omitted). "[T]he First Amendment safeguards a public employee's right, as a citizen, to participate in discussions involving public affairs; it does not empower public employees to 'constitutionalize' any grievances they have with their

employers." *Fails*, 2023 WL 5666438, at *12 (citing *McAlpin v. Town of Sneads*, 61 F.4th 916, 934 (11th Cir. 2023)).

While Thieme's use of government aircraft could be considered an "abuse and waste of government resources," which would be a matter of public concern, *Skolweck v. Mayor & Councilmembers of Garden City, Ga.*, 2012 WL 5183201, at *4 (S.D. Ga. Oct. 18, 2012), the "main thrust" of Bowen's speech involved complaints about Thieme's leadership, command style, and conduct. *See King v. Board of Cnty. Comm'rs*, 916 F.3d 1339, 1347 (11th Cir. 2019) (explaining that merely "mention[ing], or allud[ing] to," topics of public concern is not enough to "convert … employee speech into a First Amendment-protected complaint"). Indeed, even Bowen's complaints regarding Thieme's improper use of blue lights and carrying a service weapon without training are matters relating to his work for the FSG. *See Fails*, 2023 WL 5666438, at *13 (finding plaintiff did not speak on a matter of public concern because "most of the issues raised in the October 2019 Memorandum relate to perceived personal slights, and all of the issues pertain to the internal workplace dynamic at the UWF Police Department").

Moreover, this is not a case where an employee posts concerns on social media or makes his concerns public. To the contrary, Bowen prevented the FSG members from reporting their concerns to the media or the Inspector General. *See Alves*, 804 F.3d at 1162 ("A court may also consider the employee's attempt to make her

concerns public along with the employee's motivation in speaking."); *see Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993) (finding plaintiff's sexual harassment complaints not matters of public concern when plaintiff did not make her complaints public or involve the public). Thus, Bowen's speech cannot be fairly characterized as raising matters of public concern. As such, Bowen has not alleged facts from which it can be reasonably inferred that he engaged in protected speech.[4]

### D. Bowen's Speech Did Not Play a Substantial Part in His Termination

Finally, even if Bowen had alleged facts which plausibly suggest that he had engaged in protected speech, to state a claim for retaliation, he must allege facts sufficient to show the speech played a substantial part in the adverse employment action. To make that showing, Bowen must allege facts showing that a causal connection exists between his communications and Thieme's alleged retaliation. *See Bailey*, 843 F.3d at 480. The facts alleged must be sufficient to show "that the decision-makers were aware of the protected conduct" at the time of the adverse action and "the adverse actions were not wholly unrelated." *Shannon v. BellSouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002).

---

[4] Because the undersigned finds that Bowen did not engage in protected speech, the Court need not determine whether his free speech interest outweighed his employer's interest in effective and efficient fulfillment of its responsibilities under *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). *See Garcetti*, at 421 (if a public employee's speech is protected under the First Amendment, the court applies the balancing test from *Pickering*).

Here, Bowen has alleged no facts showing that Thieme had actual knowledge of his conversations with Alvarez or Collins. Instead, Bowen relies on circumstantial facts, including (1) Arnold's knowledge and role at the November 5 meeting; (2) the timing of Thieme's October 23 call to Bowen; and (3) Thieme's change in treatment of Bowen. Doc. 20 at 29. Bowen also alleges that during the December 19 call with Thieme, Thieme stated that "reaching out to representatives needs to stop," Alvarez and Collins were "small players," and the FSG's success did not depend on them. Doc. 20 at 20. Even accepting those factual allegations as true, the undersigned agrees with Thieme that those facts are insufficient to establish a reasonable inference that Thieme was aware of Bowen's conversations when Thieme relieved him of his duties.

First, it is irrelevant that Arnold knew that Bowen was the one raising concerns about Thieme's conduct because Bowen does not allege Arnold ever informed Thieme of this information. Indeed, Bowen admits he does not know what Arnold said to Thieme during the November 5 meeting. Similarly, Thieme's statement to Bowen during the December 19 call that "reaching out to representatives needs to stop" does not advance the ball because: (1) Thieme had just issued a counseling statement to Bowen directing him to counsel Stephens about going to Collins; and (2) the rebuttal Bowen wrote to Thieme on December 16—a mere three days before Bowen's conversation with Thieme—contained multiple

Page 16 of 27

references to Stephens' contacts with elected officials, including Alvarez and Collins. *See* Doc. 18-1 at 5. Thus, that allegation shows only that Thieme was aware of Stephens' conduct, not Bowen's conversations. Also, the purported changes in Thieme's conduct toward Bowen, without more, are insufficient to nudge his claim of knowledge and causation "across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570.

Finally, Bowen spoke with Collins and Alvarez in October. Thieme, however, did not relieve Bowen of his position until January, and only did so after Bowen refused to counsel Stephens as Thieme had directed. This more than 2-month gap, without facts that plausibly support an inference of retaliatory motive, is insufficient to establish a causal connection between the protected activity and the adverse conduct. *See Stoddard v. Eastman Kodak Co.,* 309 F. App'x 475, 480 (2d Cir. 2009) ("[W]here the protected activity took place two months prior to the alleged adverse action, and where there is nothing other than that temporal proximity invoked to establish a retaliatory intent, the causal relationship is not established"); *see also Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 229-30 (11th Cir. 2011) (explaining that although "the two-month gap [between the plaintiff filing an EEOC complaint and a decision not to promote the plaintiff] may be 'closer' in time … it is not 'very close'"); *VanDeWalle v. Leon Cnty., Fla.*, 661 F. App'x 581, 586 (11th Cir. 2016) (noting a gap of approximately 2.5 months is a "weak" temporal link);

Page 17 of 27

*Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We are not persuaded that three months … is sufficiently proximate to show causation."); *Hill v. Judson Ret. Cmty.*, 775 F. Supp. 1090, 1096 (N.D. Ohio Sept. 13, 1991) (finding period of approximately two months to be insufficient to support an inference of retaliation).

Because Bowen has failed to allege facts sufficient to establish a causal connection between his speech and Thieme's alleged retaliatory conduct, the undersigned finds Bowen has failed to state a claim under the First Amendment.

**E. Qualified Immunity**

*Even assuming*, arguendo, that Bowen has stated a claim under the First Amendment, dismissal is nonetheless necessary because Thieme is entitled to qualified immunity. Qualified immunity shields government officials from liability unless they violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Myrick v. Fulton Cnty., Ga.,* 69 F. 4th 1277, 1297 (11th Cir. 2023). To enjoy qualified immunity, "a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred."[5] *Echols v. Lawton,* 913 F.3d 1313, 1319 (11th Cir. 2019). Once he does that, the burden shifts to the plaintiff to show: (1) the

[5] Because Bowen does not argue that Thieme was acting outside his discretionary authority when he relieved Bowen of his duties, the undersigned will focus on whether Bowen has shown that the alleged constitutional violation was clearly established.

Page 18 of 27

defendant's conduct violated a constitutional right; and (2) the right violated was clearly established at the time of the alleged violation. *Id.*

An official's conduct violates clearly established law when "the contours of [the] right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 1323. "For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." *Maggio v. Sipple*, 211 F.3d 1346, 1354 (11th Cir. 2000). "Plaintiffs can show that a constitutional right was clearly established in three ways: (1) citing case law with indistinguishable facts that clearly establishes the constitutional right; (2) pointing to a broad statement of principle within the Constitution, statute, or case law that clearly establishes the constitutional right; or (3) alleging conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Myrick*, 69 F.4th at 1300.

However, "courts must not permit plaintiffs to discharge their burden by referring to general rules and the violation of abstract 'rights.'" *Lassiter v. Alabama A&M Univ. Bd.* of Trustees, 28 F.3d 1146, 1150 (11th Cir. 1994). "Qualified immunity is a doctrine that focuses on the actual, on the specific, on the details of concrete cases." *Id.* at 1149–50. "If case law, in factual terms, has not staked out a

Page 19 of 27

bright line, qualified immunity almost always protects the defendant." *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir. 1993), *as modified,* 14 F.3d 583 (11th Cir. 1994). Thus, "the salient question … is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

Cases addressing qualified immunity in the context of a First Amendment retaliation claim fall into two categories: (1) the challenged employment action is taken in response to the constitutionally protected speech at issue and (2) the challenged employment action is indirect retaliation "ostensibly unrelated to the employee's constitutionally protected speech." *Vanlandingham*, 483 F. Supp. 3d at 1185 (internal citation omitted). In the first category, the employer typically takes action claiming that the speech threatens efficiency, and the focus of the parties' arguments is the second step of the *Pickering* balancing test. *Id.* In the second category, causation is the primary issue, and *Pickering* balancing does not apply. *Id.* Eleventh Circuit precedent typically requires qualified immunity in the first category of cases "unless the plaintiff can demonstrate that the tilt of the balance was so strongly in favor of the employee's speech that the defendants should have known that their conduct constituted unlawful retaliation." *Id.*

As the Eleventh Circuit stated in *Stanley*, "[b]ecause *Pickering* requires a balancing of competing interests on a case-by-case basis, our decisions tilt strongly

in favor of immunity by recognizing that only in the rarest of cases will reasonable government officials truly know that the termination or discipline of a public employee violated 'clearly established' federal rights." *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1298 (11th Cir. 2000) (citing *Hansen v. Soldenwagner*, 19 F.3d 573, 576 (11th Cir. 1994)). In other words, unless the outcome of the *Pickering* balancing "inevitably" weighs in favor of the employee, qualified immunity applies. *Stanley*, 219 F.3d at 1298 ("we cannot say that the *Pickering* balance would lead a reasonable police chief to 'the inevitable conclusion' that Stanley's speech was protected by the First Amendment") (citing *Dartland v. Metropolitan Dade Cnty.*, 866 F.2d 1321, 1323 (11th Cir. 1989)).[6]

This case falls in the first category and Thieme is entitled to qualified immunity. Had Bowen engaged in protected speech and were the Court to apply the *Pickering* balancing test, the undersigned cannot say that Thieme would have reached "the inevitable conclusion" that Bowen's speech was protected by the First Amendment. *See Vanlandingham*, 483 F. Supp. 3d at 1186 (granting motion to dismiss on qualified immunity grounds, and stating "this Court cannot conclude under *Pickering* balancing in this case, where the individual Defendants have argued

[6] *See also Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 729 (9th Cir. 2022) ("The question whether a public employee or contractor 'enjoyed a clearly established right to speak' depends on 'whether the outcome of the *Pickering* balance so clearly favored [the plaintiff] that it would have been patently unreasonable for the [government] to conclude that the First Amendment did not protect his speech.'") (internal citation omitted).

that cooperation among law enforcement agencies is important to the functioning of the City, that the balance was so strongly in favor of the employee's speech that the individual Defendants should have known that their conduct constituted unlawful retaliation") (citing *King*, 2018 WL 515350, at *4 (stating that even if clearly established law showed plaintiff's speech was citizen speech on a matter of public concern, it was not clearly established that the *Pickering* balancing test would weigh in the plaintiff's favor), *aff'd*, 916 F.3d 1339 (11th Cir. 2019)).

In Bowen's response to the motion, he argues that under *Lane*, *Garcetti*, and their progeny "reasonable officials had fair warning that the First Amendment prohibits terminating an employee for speech on matters of public concern made outside the scope of ordinary job responsibilities." Doc. 30 at 30. This argument, however, fails to properly frame the qualified immunity question. *See Echols*, 913 F.3d at 1324 ("Echols also relies on the broader principle 'that the act of retaliation for the exercise of constitutional rights is clearly established as a violation,' but this general principle is too broadly stated to control our inquiry."). "True, 'it is 'settled law' that the government may not retaliate against citizens for the exercise of First Amendment rights.'" *Id.* But that general principle does not resolve with "obvious clarity" that terminating a volunteer member of the FSG for reporting complaints about the FSG Director outside of the normal hierarchy violates the First Amendment. *See id.* at 1324–25.

Instead, the question is whether a reasonable commander of a division of a quasi-military volunteer organization, such as the FSG, "faced with the [facts as alleged in the amended complaint], and acting at least in part with a lawful motive would have known that terminating [Bowen] violated clearly established law." *See Stanley*, 219 F.3d at 1297. The undersigned finds the answer to that question is no. In *Lane*, the Supreme Court held that individual defendants were entitled to qualified immunity because no existing case law made it clear that a government employer could not fire an employee because of his conduct in a lawsuit. The Court determined that the "dispositive point" of the qualified immunity inquiry is whether at the time of the plaintiff's termination, Eleventh Circuit precedent provided clear notice that subpoenaed testimony concerning information acquired through public employment is speech of a citizen entitled to First Amendment protection and determined it did not. The same is true here.

First, aside from cases generally denouncing First Amendment retaliation, Bowen points to no cases, nor has the Court identified any, "which would have clearly established as a matter of law that [Thieme] cannot act lawfully under these circumstances—even when we accept that the circumstances do include a retaliatory motive on account of [Bowen]'s protected speech." *Stanley*, 219 F.3d at 1297. Second, Bowen's reliance on the Eleventh Circuit's decision in *Acevedo v. City of Miami*, -- F.4th --, 2026 WL 2508872 (11th Cir. Aug. 26, 2026) is misplaced.

In *Acevedo*, the Defendant City Commissioners and City Manager "suspended and terminated the plaintiff, Police Chief Hubert Acevedo, in retaliation for a whistleblowing memo that he wrote to outside law enforcement agencies implicating the defendant Commissioners."[7] *Id.* at *1. The memo described how certain Commissioners had "attempted to weaponize the [Police Department], interfered with [Police Department] internal and external investigations, and impeded reform at the [Department]." *Id.* at *2. And, because the Commission had no "authority to manage the [Police Department] or otherwise dictate [Police Department] decisions, the memo "did not disrupt the functioning of the Police Department or the municipal government." *Id.* at *3. "[I]n fact [the memo] did not[] have any negative effect on the Commission's ability to run the department—a power which it did not have." *Id.* Thus, unlike the question before this Court, the question the court considered in *Acevedo*, for purposes of qualified immunity, was whether it was clearly established that a police officer could not be terminated in retaliation for whistleblowing. The Eleventh Circuit answered that question affirmatively. *See id.* at *11 ("When viewed in this light, we think 'already-existing law' makes the 'the unlawfulness of the conduct' apparent.").

*Acevedo* is distinguishable. Unlike the allegations in *Acevedo*, Bowen did not submit a whistleblower complaint alleging criminal conduct to law enforcement. As

[7] The memo was sent to the FBI and the State Attorney's Office.

stated above, Bowen prevented the FSG members from making such a report. Also, Bowen went to Collins, who is in Governor's office, to report concerns regarding his direct supervisor, and the Governor has final command and control of the FSG and "shall commission all volunteer personnel" of the FSG. Fla. Stat. § 251.001(2), (5)(b). In contrast, in *Acevedo*, the court repeatedly noted that the Commissioners have no oversight over the police force.

Moreover, in *Acevedo*, the court recognized the "'heightened need for order, loyalty, morale and harmony in a quasi-military organization … ' can tip the *Pickering* balance in an employer's favor," but rejected that argument because those "precedents" involve suits brought by officers against their direct superiors. *See Acevedo*, 2026 WL 2508872, at *9. And, in *Acevedo*, there was no allegation regarding why the defendants took adverse action against the plaintiff; that is not true here. Here, Bowen sues his direct supervisor. Bowen alleges he was terminated after he refused to counsel Stephens for going outside the chain of command with the MOU. Thus, unlike the complaint in *Acevedo*, the amended complaint provides a potential justification for Bowen's termination. *See id.* at *12 (noting that at "later stages of litigation []the defendant Commissioners will be able to introduce evidence that they had a justification for terminating Acevedo because his speech—i.e., that his memorandum undermined morale or was disruptive or something similar") (citing *Jackson v. Humphrey*, 776 F.3d 1232, 1241 (11th Cir. 2015) (holding that,

when the facts "show both a lawful and unlawful motivation for the decision made by a government official, the official is entitled to qualified immunity")).

Finally, in the Notice of Supplemental Authority (Doc. 32), Bowen argues this Court should follow the decision in *Howard v. Huhman*, N.D. Fla. Case No. 4:26cv161-RH/MAF, denying a motion to dismiss on qualified immunity grounds. Although both cases involve speech by an FSG member, the factual similarities end there. Like *Acevedo, Howard* is inapposite.

Unlike the facts alleged here, the plaintiff in *Howard* was demoted for speaking out on social media about $14 million of alleged fraud, waste, and abuse within the FSG. Specifically, the plaintiff published a video podcast through his personal social media platform, directed his speech to members of the public, taxpayers, and government officials, and did not confine his speech to his supervisors, coworkers, subordinates, or chain of command. N.D. Fla. Case No. 4:26cv161, Doc. 24. Also, unlike the facts alleged here, the defendants had actual knowledge of the posts and criticized the plaintiff for them. Moreover, the plaintiff was demoted within two weeks of making the posts.

More importantly, the arguments the defendant in *Howard* raised in his motion to dismiss are different from those raised by Thieme. First, the defendant conceded the plaintiff spoke as a citizen on a matter of public concern. Second, the defendant argued he was entitled to qualified immunity because it could not be

reasonably inferred from the facts alleged that defendant engaged in any adverse action against plaintiff. The court disagreed and found "[t]he amended complaint sufficiently alleges [defendant] participated in the averse actions." Thus, the court denied the motion to dismiss because "a public official does not have qualified immunity for demoting an employee in retaliation for social media posts." *Id.,* Doc. 43 at 15. The court did not discuss *Stanley*, or address whether the *Pickering* balancing test "inevitably" weighed in favor of the plaintiff; *Howard* is distinguishable.

At bottom, to establish that Thieme was on notice, Bowen must "either produce a case in which speech materially similar to [his] in all *Pickering–Connick* respects was held protected, … or show that, on the facts of [his] case, no reasonable person could believe that both prongs of the test had not been met." *Maggio*, 211 F.3d at 1354–55 (citing *Martin v. Baugh*, 141 F.3d 1417, 1420 (11th Cir. 1998)). Bowen has not done so. *Id.* (holding defendants are entitled to qualified immunity because plaintiff "failed to produce a case in which speech materially similar to hers was held to be protected"). Thus, even if Bowen had stated a claim for retaliation under the First Amendment, Thieme is entitled to qualified immunity.

## IV. CONCLUSION

For the reasons stated above, Thieme's motion to dismiss should be granted.

Accordingly, it is RECOMMENDED that:

1. Thieme's amended motion to dismiss (Doc. 28) be GRANTED.

2. Bowen's claim against Thieme be DISMISSED.

3. The clerk close the file.

At Pensacola, Florida, this 16th day of October, 2026.

/s/ Hope Thai Cannon

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE

Objections to these proposed findings and recommendations must be filed within **fourteen (14) days** of the date of the Report and Recommendation. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1.